All right, the attorneys have now joined us. Thank you. Case number 14-5720, United States of America v. Kevin Churn. Argument not to exceed 15 minutes per side. Ms. Salinas, you may proceed for the appellant. Good morning. Good morning, your honors. May it please the court, this is Melissa Salinas on the line, and I'm here in Ann Arbor, Michigan with law students Kevin Potter and Andrew Guy. They're with the University of Michigan Federal Appellate Litigation Clinic, and under my supervision, they'll be arguing the case today. That's fine. You may proceed. May it please the court, my name is Kevin Potter, and I represent Keith Churn along with my partner Andrew Guy. I will discuss the email hearsay issue, which is reviewed for abuse of discretion. Andrew Guy will discuss the restitution issue, and given our limited time, we will rest on our briefs with respect to the other issues unless the court has questions. Okay. Mr. Churn suffered evidentiary errors that both individually and cumulatively deprived him of a fair trial. Specifically, the trial court admitted, in one instance, an email to a Bank Corp South employee, Ms. Lisa Campsey, that contained out-of-court statements attributed to Bob, an All-American Homes employee. Allegedly, Bob said that he was not familiar with any modular homes coming out of Indiana, that Mr. Churn said he would wire money to Bob soon, and that production of a modular home could begin as soon as Mr. Churn sent out the money. Bob's statements lacked an admissible, non-hearsay purpose, and so those statements were hearsay taken for the truth of the matter asserted. Bob's hearsay unfairly prejudiced Mr. Churn two times over. First, the hearsay created an inference of fraudulent intent, because Ms. Campsey previously received information from Mr. Churn that the hearsay contradicted. The intent was an element of each count charged against Mr. Churn, so this inference unfairly advanced the government's case. Second, the hearsay unfairly impeached the credibility of Mr. Churn and his defense when he took the stand. The inference of past dishonesty created an inference that Mr. Churn could not be trusted as a witness when he tried to defend himself. Third, the hearsay was the only evidence to directly contradict Mr. Churn's defense, that he attempted to purchase homes from All American Homes in order to complete his construction contract, but then All American Homes declined to build for him. With unfair prejudice compounding unfair prejudice, the email hearsay denied Mr. Churn the fair chance to defend himself. Now, just to try and highlight how the prejudice impacted Mr. Churn, Your Honors, it helps to look at the cross-examinations that were performed against the witnesses who did come to trial. Hearsay is presumptively barred because the general rule is that you confront the declarants of damaging testimony, and that testimony is always going to come in through some kind of listener or record. Normally, cross-examination provides the opportunity to contextualize damaging testimony, to develop doubt about that testimony, to explore the foundation of that testimony. And when hearsay comes in improperly, the defendant is denied the fair opportunity to defend himself in a fair way. Now, just to take, for example, the direct testimony of Inspector Jerry Lillard. He testified on direct that Mr. Churn completed only a small percent of the total work that he was supposed to complete, but Mr. Lillard admitted on cross that the inspection form underestimated the percentage of completed work. Both because it was not the correct form for this kind of project, and because he decided to protect the bank by declining to properly credit when new work was completed. As well, he impeached his own contrary direct testimony, as well as the contrary direct testimony of Ms. Cancey, when he admitted that Mr. Churn's work had prepared one of the lots, quote, for whatever project took place. Similarly, the government used testimony from Neil Sayers, a retired All-American Homes employee, to imply that Mr. Churn had invoiced inflated costs and improper costs to the bank, and that Mr. Sayers had never seen anyone inflate their costs in this manner. And this was one of the ways the government tried to establish fraudulent intent on several accounts. But when Mr. Churn's attorney had the opportunity to cross and recross Mr. Sayers, Mr. Sayers eventually admitted, well, when you're sending a bill out, as opposed to sending it to us, where in that situation, All-American is more like a subcontractor, sure, the builder's going to have a markup. Sure, the builder's going to bill for electrical costs, for plumbing costs, for other costs that the government tried to establish on direct were improper. And the point you're honoring is not that the evidence was insufficient in this case, but that Mr. Churn didn't have a similar opportunity to hit back against the declarations of Bob as the opportunity that he had to hit back against the witnesses that did appear at trial. So Bob is making these extremely damaging accusations. I talked to Mr. Churn. He told me he would send me the money. Mr. Churn is the one holding up the project. And this is essentially the strongest inference that the government can try to establish of fraudulent intent in the whole case. We don't have elsewhere in the record an All-American Homes employee who worked directly with Mr. Churn, who had an opportunity to observe or testify to conduct of Mr. Churn or statements of Mr. Churn that came anywhere near the level of damage that was caused by these out-of-court declarations that should not have been admitted. Okay, well, your time has expired. Are you Kevin Potter? Yes, that's correct, Your Honor. I thought so. Well, thank you, Mr. Potter. Your initial time has expired, and we'd like to hear next from Mr. Guy. May it please the Court, my name is Andrew Guy, and I represent the defendant, Mr. Keith Churn. I will be discussing the application of the Sixth Amendment to the restitution order. The jury acquitted Mr. Churn of four counts. The government dismissed two additional counts before trial even began. Yet the district court still used these six acquitted and dismissed counts to increase Mr. Churn's restitution order by over $140,000 beyond the statutory maximum. These judicial findings violated the Sixth Amendment. Apprendi versus United States… Counsel, this is Judge Stranch. Did you raise the Apprendi issue either in trial or at sentencing? Yes, Your Honor. It was raised in the sentencing memorandum on page ID 770 to 771, and then it was also raised during the sentencing proceedings, and you can find that in the transcript on page ID 908 and 909, and therefore this should be reviewed de novo. Was it raised as a challenge to determining the amount of loss for the purpose of setting the base offense level, or was a specific Apprendi claim raised? The claim was that the use of acquitted and dismissed conduct was improper as it applies to restitution, and that it was a violation of the Sixth Amendment, which implicates Apprendi versus United States, Your Honor. And the reason that counsel raised that argument was because this was a violation of Apprendi according to Blakely versus Washington, and Blakely on pages 303 and 304 explained that the statutory maximum for Apprendi purposes is, quote, the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict, unquote. And here, that statutory maximum was $97,600, and that's the amount of losses that's tied to each convicted count. Let me ask again, Counselor, I'm struggling with the relationship between your argument on acquitted and dismissed conduct versus an Apprendi argument. Isn't the case law that governs acquitted or dismissed conduct under the Supreme Court Watts case and under our white en banc case, very simply that the court can use that as relevant conduct in sentencing? Yes, Your Honor, the court can use acquitted and dismissed conduct, provided that it does not go above the statutory maximum, the idea being that that sentence is still supported by the jury verdict. So provided that the district judge does not go above the statutory maximum prescribed by the jury verdict, the judge can consider acquitted and dismissed conduct. But what happened here was- And how do you define statutory maximum in terms of restitution? I don't see this as a fine. For example, the Southern Union case where it's an actual fine stated in the statute. Where, in light of our Sosebee case, do you find a statutory maximum stated for restitution calculation purposes? Yes, it's the statutory maximum that's described in this court's United States v. Freeman case, and that's the amount tied to the offense of conviction. And that maximum is appropriate based on the Supreme Court Southern Union case, because Southern Union contemplated a maximum that could vary from case to case. In that case, the Supreme Court was considering 18 U.S.C. 6928D. That statute concerned a fine of not more than $50,000 for each day of violation. So depending on the jury verdict, the fine could be $250,000 if five days were found, or $100,000 if two days were found. And so the maximum would vary widely. And the court said that that was a statutory maximum for Sixth Amendment purposes, and Apprendi v. United States did apply to that statute. The court went on to describe other statutes where the Sixth Amendment applies, and that's on page 2351 of the Southern Union opinion. I would particularly note 18 U.S.C. 3571, which discusses a fine of, quote, not more than the greater of twice the gross gain or twice the gross loss, unquote. The Supreme Court said that that statute, which tied a maximum to the amount of loss, did prescribe a maximum for Sixth Amendment purposes. And in the same way, the Mandatory Victims Restitution Act, which ties a maximum to the amount of loss, describes a maximum for Sixth Amendment purposes. And the court would be- Help me understand how that fits with SOSAB, which came before Freeman and was published before Freeman, that pretty blank, in blank language, says that Apprendi doesn't apply because there's no statutory maximum for restitution because restitution is indeterminate due to the number of variables in its calculation. I don't understand how we can flip to Freeman in light of SOSAB's clear statement about Apprendi. Yes, Your Honor, SOSAB does state that. However, that's not necessary to reach the holding in SOSAB. United States v. SOSAB involved a determination of losses, and the court held that Apprendi did not apply to that objection for two independent reasons. And one of those reasons was that the Mandatory Victims Restitution Act said that losses will be, quote, determined by the court, unquote. And since that discretion is left to the judge, there is no violation of the Sixth Amendment. What we have here, instead of a determination of losses, we have a determination of criminal conduct. And unlike losses, which the Mandatory Victims Restitution Act allows a judge to find, criminal conduct is not prescribed to the discretion of the judge. Criminal conduct should be found by the jury, and it was not here. So this case is distinguishable from SOSAB, and SOSAB, to reach the holding there, can simply be found based on that determination of losses. Guys, it's Judge Cole. I just have one quick question. Are there any cases from any circuit that have held that Apprendi applies to this Mandatory Victims Restitution Act? No, Your Honor. However, it's important to note the unique situation this circuit is in. Some circuits have held that restitution is a civil punishment, and therefore Apprendi does not apply. However, this court has held both in United States v. SOSAB and United States v. Schulte that restitution is a criminal punishment, and that's consistent with at least four other circuits. Some other circuits have held that Apprendi does not apply to restitution because of the indeterminate maximum. However, this court held in United States v. Freeman, and it was necessary to reach the holding in Freeman, that there is a maximum in the MVRA, and that's consistent with at least one other circuit. No circuit has held both of those things, that restitution is a criminal punishment, and that the Mandatory Victims Restitution Act has a maximum. And both of those holdings are necessary to reach the outcome that Apprendi applies, and this circuit, having reached both of those holdings, should find that Apprendi v. United States does apply to restitution orders. Okay, Schmidt. Thank you, Mr. Guy. Any other questions? Your initial time has expired, and you and or Mr. Potter will have three minutes of rebuttal. Why don't we hear next from the government? Thank you. Thank you. Thank you, Chief Judge Cole. Good morning from Washington, D.C., Your Honors. May it please the court, Dave Lieberman for the United States. Mr. Chern has not demonstrated reversible error in any of the district court's evidentiary rulings or sentencing determinations. Let me focus on the issues that my adversaries have raised this morning. To the first claim, the district court did not abuse its discretion in admitting an e-mail sent from the loan officer to Mr. Chern that contained out-of-court statements by Bob from All American Homes. I just want to be clear, the district court received a hearsay objection and admitted this e-mail for a non-hearsay purpose. The district court then instructed the jury to consider it only for that non-hearsay purpose, which was the loan officer's state of mind, and to explain her subsequent conversations with Mr. Chern. So, in the government's view, we don't even get into a hearsay analysis. Let me walk through each of those points individually. First, this e-mail was not admitted for the truth of the matter asserted. The government admitted the e-mail to show the date on which the bank and the loan officer learned that Mr. Chern had not actually placed orders for the modular units with All American Homes. The e-mail shows that early March was the first time the bank learned of this. The government then used the e-mails that it tossed money from the loan officer to explain why that information prompted her, to then demand a full account of how Mr. Chern spent the bank's money, wire transfer records. The loan officer now demanded a written guarantee from the manufacturer that home orders had been placed. This all goes to the loan officer's state of mind and to explain those actions. Now, this was relevant, and this has been a point of contention in the brief. I will point out that there was no relevance objection raised below to the non-hearsay purpose. But this was relevant because Mr. Chern made it relevant. In his opening statement in particular, Mr. Chern's counsel told the jury, in explaining his conduct, that in this early 2007 time period, when All American Homes went out of business, Mr. Chern had trouble finding other units or other manufacturers. The bank then grew uneasy with Mr. Chern's efforts and called in the loan. In light of that defense, the government was allowed to put on evidence noting the true reason for why the bank grew uneasy and the true reason that the bank started making demands of Mr. Chern. Mr. Chern opened the door and the government fairly responded in his case. And that was Mr. Chern's defense throughout trial to demonize the bank and its motives in this case. Even if the jury disregarded the district court's instruction and considered Bob's statement for the truth therein, the error would be harmless. First, as to the fact that Mr. Chern had not actually ordered modular units, that was already established in the record. The government called the former vice president, who was employed at the time with All American Homes, and who testified that he conducted a full records check of the company files and found no documents purporting to order home orders by Mr. Chern. Now, Mr. Potter also says that these out-of-court statements demonstrated, or it was the government's key proof to demonstrate dishonest scheming. I differ with that assessment. I think we have quite a bit of evidence of dishonest scheming, and I would point the court's attention to Government Exhibits 13 and 38. These were the invoices that Mr. Chern sent. The invoices were dated December of 2006. They were sent to the bank, and they were submitted to the bank as invoices, as actual home orders. Government Exhibit 38 is an email from Mr. Chern to the loan officer. Quote, this is the invoice for Green Street. House will be delivered in early February. So he is telling the bank that he has placed orders for the home, but Chern knew at the time that he had actually never in fact placed those orders, that the homes had actually not been ordered. That was the—and that he actually admitted on direct, in his defense, that he drafted those invoices, that they did not come from all American homes, and this all lines up with the government's evidence that no home orders were placed. So Mr. Chern— Counsel, this is Judge Strach. These arguments are outlined also in your briefing. I'm a little more interested in the restitution claim. Could you turn to that, please? Absolutely. Absolutely. First, to jump off your question to opposing counsel, the government's view is that so-to-be is the law of this circuit. Judge Daughtry's opinion for the court quite clearly states that Apprendi did not apply to restitution orders because the MDRA does not prescribe a statutory maximum. Panels of this court today continue to apply that holding, and it defeats Mr. Chern's entire application of Apprendi. Now— How do you distinguish Southern Union's reference to fines as being your opposing counsel say that that is comparable to what we have here in the calculation of restitution? Why are they not correct? So Southern Union involved— The jury verdict triggered a determinate statutory maximum in that case. So if we just look at the jury verdict in Southern Union, the maximum fine that the district court could have ordered before any fact-finding was $50,000. So that was the ceiling. Now what happened, the district court in that case then made additional fact-finding, which inflated the maximum fine to $38 million. So that was the jump. That violated the Apprendi rule. The issue here is that the court has a prior decision, so to be, that the MDRA does not prescribe a statutory maximum. That was actually the law in all the circuits. And then look at page—in the Supreme Court Reporter 2353 of Southern Union. There is no Apprendi violation where the statute does not prescribe a statutory maximum. So the government is 6-for-6 across the circuits right now in that all the circuits had a similar type of society case on the books. And then they all looked at Southern Union and said our prior holding, the MDRA, does not have a prescribed statutory maximum. Marries up to the Southern Union language that says no Apprendi violation where there's no prescribed statutory maximum. Five circuits have issued published decisions reaching that conclusion. Three panels of this court have issued unpublished decisions reaching that conclusion. We think that so to be is still the law of the land and dictates the outcome, in this case, at least before the panel. Now, Mr. Guy has also referenced the Freeman decision. Well, Freeman was not about Apprendi, first off, so it doesn't do anything to undermine a prior published decision holding that Apprendi doesn't apply. And actually, I think that both Freeman and so to be can be read together. What Freeman says is that the MDRA has a statutory maximum, but it's indeterminate. The losses are tethered to the offense of conviction. It floats up and down depending on the unique circumstances of the case. What Judge Daugherty's opinion in so to be says and the citations in the decision bear this out is that Apprendi doesn't apply because the MDRA lacks a prescribed or a determinate statutory maximum. Freeman did not opine on the question of whether or not any statutory maximum is determinate or prescribed. And that is, I think, a helpful way to read the two together. Counselor, isn't there also a distinction that Freeman did not involve one of the victim definition statutory exceptions for a scheme? Freeman was not a scheme. It was not a conspiracy. So do the two not work together based on the definition of victim? That's exactly right. And that goes to the claim that Your Honor questioned my adversaries about the difference between acquitted and dismissed conduct. In the government's view, the district court fixed restitution based on convicted conduct. Mr. Chern was convicted of participating in a scheme. The jury found that. And the MDRA explicitly instructs district courts where the element of the offense contains a scheme or a conspiracy to fix restitution with respect to that instead of individual counts of conviction. So just about the focal point that we're looking for, Mr. Chern was still convicted of the scheme and that is the basis on which to fix restitution. It was not based on acquitted conduct. So if we line up SOSAB, we line up all the decisions from the other circuits, no other circuit has gone the other way, and we line up the plain language of the MDRA, it all points to the conclusion that the district court's restitution order in this case was valid, both as a matter of the statute and as a matter of the Sixth Amendment. So I believe I've addressed the claims that Mr. Chern's counsel have raised. I'm also happy to address any other questions about any other claims if the panel has any concerns. Apparently not, Mr. Lieberman. Thank you. We would ask that the court affirm. Okay, thank you. Okay, there's three minutes of rebuttal. I'm not sure who's handling that, but you may proceed. Thank you, Your Honor. This is Andrew Guy representing the defendant, Mr. Keith Chern. First, I'd like to make a point about the evidentiary issues. This was an extremely close case where the jury acquitted on four counts. In this case, it's not about the sufficiency of the evidence, but whether or not the outcome changed based on the hearsay that was admitted into trial. And we think based on the closeness of the evidence and the closeness of the case, this hearsay did sway the jury verdict. Turning to the application of the Sixth Amendment to the restitution issues, as the government pointed out, there have been cases applying SOCIB. However, every one of the subsequent cases has involved determination of losses, which is consistent with the actual holding of SOCIB that appending does not apply to applications of judicial determinations of losses. What SOCIB does not say is whether or not a judge can determine other criminal conduct. I'm sorry, counsel, you cut out. Could you repeat that last sentence, please? Sure, Your Honor. The cases following SOCIB were consistent with the holding in SOCIB that appending does not apply to a judicial determination of losses. However, what this court has not reached is whether appending applies to a judicial determination of criminal conduct for the purposes of the Mandatory Victims Restitution Act. So this case is distinguishable from SOCIB and the line of cases following SOCIB. In addition, the government points out that no other circuit has held that appending applies to restitution orders. However, I would point out to this court the Ninth Circuit's decision in the United States v. Green, which expressed extreme skepticism that its prior holdings were consistent with Southern Union. And had those cases come down after Southern Union, they may come out differently. This court is in a unique position. This court has not squarely held that appending does not apply to restitution orders. Rather, it has held that appending does not apply to determination of losses in restitution orders. So this court, unlike the other circuits, has not directly held that appending does not apply. And so this court can hold consistent with Southern Union that appending does apply to determinations of criminal conduct for the purposes of the Mandatory Victims Restitution Act. And here, the district court went above that maximum and in doing so violated the Sixth Amendment. And for that reason, we request resentencing. Thank you. Okay, well, thank you, Mr. Guy. We certainly appreciate your arguments today. Ms. Salinas, on behalf of, I guess, in your supervisory capacity at the University of Michigan, thank you for serving in that role. And we very much appreciate the arguments today of both of you, Mr. Guy and Mr. Potter. You did an extremely fine, thorough job. So as is always the case, law students prepare very thoroughly for oral arguments, and you've done just a fine job today. So we thank you. And, Mr. Lieberman, we'd like to thank you as well. Thank you. Equally thorough argument. And with that, I don't think there's anything else.